PICKETT, Judge.
This is a suit by the plaintiff, Albin Guillot, d/b/a Al’s Dozer Service, against the defendants, Sam P. Ryan and S & R Adhesive Co., Inc., in which the plaintiff seeks to recover the sum of $3,675.00, the value of certain fill dirt hauled, delivered and spread by the plaintiff at a building site owned by defendants, under the terms of a contract with the defendants. The defendants answered the plaintiff’s petition with a general denial of liability; and reconvened for damages alleged to have resulted from the failure of the plaintiff to comply with the terms of his contract, particularly, but not exclusively, by his failure to provide the quality of material agreed upon, and because of his failure to spread and compact the dirt fill as agreed. Furthermore, the defendants alleged the plaintiff did not deliver the quantity of dirt fill claimed by him.
Judgment was rendered in the lower court in favor of plaintiff, Albin Guillot, and against the defendants, Sam P. Ryan, and S & R Adhesive Co., Inc., jointly, severally and in solido, in the sum of $3,675.-00, plus legal interest thereon from November 17, 1970, until paid, and for all costs of the proceeding. The defendant, Sam P. Ryan, has appealed suspensively.
*756 The evidence shows that the defendant, Sam P. Ryan, is the owner of S & R Adhesive Co., Inc., a corporation, located in New Orleans, which is engaged in the manufacture of adhesive compounds. Mr. Ryan decided to relocate his New Orleans plant in St. Tammany Parish. For the purpose of relocating the plant, Mr. Ryan acquired for his plant site a parcel of land in Section 19, Township 6 South, Range 10 East, containing 4.58 acres, situated in St. Tammany Parish, which is more particularly described in Paragraph One of the plaintiff’s petition. On this parcel of land the defendant, Sam P. Ryan, hereinafter referred to as Ryan, erected a prefabricated metal building, which is fifty feet in width and one hundred twenty-five feet in length. The foundation, upon which the building rests, consists of a layer of concrete footing on top of which a chain wall of concrete blocks was constructed around the entire perimeter of the site of the building. The wall was four feet in height. The manufacturing process carried on by Ryan’s corporation required the use of such equipment as a boiler, kettles, and 55-gallon containers and storage tanks. Ryan’s plans called for a concrete slab designed to serve as the interior floor of the building! His construction plan called for the rectangular shaped box-like chain wall of concrete blocks, on which the building would rest, to be filled with dirt to the top of the wall. The concrete floor was to be poured on the dirt fill. It was necessary that the base on which the concrete floor was to be constructed, as well as to the floor itself, should be strong enough to support the heavy equipment to be used in the manufacturing processes to be carried on in the building.
Ryan contracted with Albin Guillot, hereinafter referred to as Guillot, to supply the dirt needed to fill the rectangular box formed by the chain wall of concrete. Accordingly, on July 29, 1970, Guillot and Ryan entered into a contract ■ in which Guillot agreed to deliver and spread with a bulldozer approximately 1,000 cubic yards of clay fill dirt for the price of $25.00 per 12 cubic yards load.
The evidence shows that beginning on or about July 29, 1970, to September 14, 1970, the plaintiff made deliveries of dirt to the plant site with two trucks, each with a twelve cubic yard capacity. Guillot alleges he delivered and spread, according to the terms of the contract, 153 loads of fill dirt. But when Guillot requested Ryan to pay for the dirt he refused to pay for it. Ryan gave as his reasons for his refusal to pay for the dirt that Guillot did not deliver the quantity of dirt claimed by him, and that the dirt delivered was unsuitable for the purposes intended and, furthermore, Guillot did not spread the fill as agreed to in the contract. The defendant reconvened against Guillot for damages which he alleges he suffered because of Guillot’s breach of the contract by his failure to deliver suitable fill dirt and to spread it as agreed upon. Ryan also claims damages because of the plaintiff’s delay in performing what work he did perform.
The appellant alleges the trial judge committed the following errors:
“The evidence shows that the quantity of fill for which S & R Adhesive Company was billed was not received.
The evidence shows that the fill was not compacted.
The evidence shows that the fill was inferior by reason of the debris, roots and stumps found in it.”
The plaintiff, Guillot, in support of his claim for fill dirt hauled, produced 153 delivery tickets, each of which he said represented a truck load of 12 yards of fill dirt. The delivery tickets had been numbered from 1 to 153 consecutively for the purpose of the trial. Mr. Otho E. Sleeth, who was identified as Ryan’s overseer during the time the plaintiff was hauling the fill dirt, testified at length concerning the delivery tickets. He acknowledged his signature on all but a few of the delivery tickets. A few of the delivery tickets were *757 signed by either Wayne Dufour, Billy Bennett, or a Mr. Loyd, all of whom, Mr. Sleeth said, were employees of Ryan. Mr. Sleeth testified that each ticket represented one 12 cubic yards load of fill dirt. The delivery receipts filed in evidence shows that 1,800 cubic yards of fill dirt was actually delivered and spread at the job site. In fact, counsel for Ryan admits as much, but suggests that Mr. Sleeth would sign an original ticket and in place of a carbon copy, would sign a blank ticket. Mr. Sleeth was questioned at length about his signatures on the delivery tickets, but he could not be positive that any of the tickets were duplicates, or carbons. The district judge in his oral reasons for judgment dictated into the record, said:
“The court noted the tickets seemed to be numbered, for the purpose of the trial, in sequence from the number one through the number 153 and except for one or two little tickets, the court cannot reach any conclusion that there has been any duplication in these tickets which serve as invoices, or that the dirt was not, in fact, delivered to the site.”
We have carefully reviewed all of the evidence relative to the sufficiency of the delivery tickets, and we are unable to say the findings of fact of the trial court that the fill dirt was delivered to the job site as disclosed by the delivery tickets is manifestly erroneous.
The defendants point out that the quantity of dirt which the plaintiff alleges he hauled could not be placed in the space provided for it. The foundation of the building was 50 feet by 125 feet. A chain wall four feet high was constructed of concrete blocks around the area to be filled with dirt. The defendants contend that the space to be filled by dirt would only contain 967i/2 cubic yards in the interior of the building, and 262]/ cubic yards on the exterior. But Mr. Lyman Ellzey, a consulting civil engineer, a witness for the defendants, who had calculated the capacity of the space to be'filled with dirt, admitted that the loose dirt could be packed so that a quantity of dirt greatly in excess of 967% cubic yards could be physically placed inside the concrete wall of the structure. However, Mr. Ellzey said he had not calculated the quantity of dirt that might be placed in the space provided for it; but he did say: “I can tell you it is possible to put 1,500 yards in there, yes.” By adding to the 1,500 cubic yards of dirt that Mr. Ellzey admits could be put inside the structure, the 262% cubic yards of dirt that he said was needed on the exterior, we have almost the quantity of fill dirt that the plaintiff claims' he delivered to Ryan’s job site. Furthermore, the defendants have failed to show with any degree of certainty the quantity of dirt that was delivered to the job site. We have the positive evidence of the two truck drivers, Odell Garrett and Ollie Stanfield, that they delivered the quantify of dirt the plaintiff claims he delivered. The Trial Court concluded the plaintiff actually delivered 1,800 cubic yards of dirt fill to the building site, and that the appellee is entitled to be paid the sum of $25.00 per truck load for 153 loads, less $150.00, as provided in the contract the litigants signed on July 29, 1970. We concur in the findings of the trial court.
In support of his claim for damages, the appellant charges the appellee breached their contract by failing to compact the fill dirt. The agreement signed by the parties to this litigation shows that the appellee agreed to deliver the clay fill and “spread” it with a dozer. The appellant apparently contends that spread and compact are synonymous. However, the testimony in the record is to the effect that “spreading” and “compacting” are two different procedures. Mr. Doyle Glass testified that there, is a difference between spreading dirt and compacting it. He said that spreading dirt means leveling it up. But in order to compact dirt, it would be necessary to use either a wobblewheeled roller or a sheepfoot roller. Mr. Glass explained that to spread dirt a dozer or rubber tired tractor is used to spread it and *758 push it down. He said, of course, in spreading dirt you get a certain amount of compaction. However, he testified that when you undertake to compact dirt, it is necessary to use a wobblewheeled roller, or a sheepfoot roller.
In the case of C. M. Penn & Sons v. A. Giambelluca Construction Co., La.App., 259 So.2d 594, this court held that a contract for supplying and spreading dirt would not require compaction and in that connection, said:
“It is the argument of Giambelluca that the concept of compacting was included within the contractual obligation of ‘spreading’. The evidence is overwhelming in this case, however, that, not only is ‘compaction’ a very different process from spreading, but also, that none of ihe parties contracting for the project involved herein intended for the dirt to be ‘compacted’.”
We conclude that the trial court did not err in construing the word “spread” to mean something different from “compact.”
The appellant complains that the fill was inferior because of debris, roots and stumps found in it. Mr. Ellzey, the expert witness for defendants, testified at one place as follows: “I think the material was allright.”
The evidence indicates that there undoubtedly were some roots and stumps in the dirt that was supplied by the appellee. But when the appellant complained about the roots and stumps, the employees of the appellee removed the debris. Furthermore, we agree with the trial judge that if there were a sufficient number of roots and other debris in the dirt to seriously impair its usefulness, complaint should have been made as the dirt was delivered in order that the matter might be remedied.
Our examination of the evidence convinces us that the Trial Court did not err in concluding that the roots and other debris did not seriously affect the quality of the dirt delivered.
The appellant in his reconventional demand seeks a judgment against the appel-lee in the amount of $33,322.00. However, the appellant in his brief has asked this court to award him the sum of $3,770.16 for damages he claims to have suffered because of the poor quality of the dirt fill, and the presence of roots and other debris therein, and the failure of the appellee to compact the dirt as provided in the contract. He claims he was required to employ the Covington Dozer Service to compact the dirt fill. Furthermore, because of the poor quality of the fill, it was necessary to employ Christopher Lee to drill 200 holes in the dirt fill, five feet in depth, into each of which he placed a 20 foot steel bar, which was bent four ways to provide additional support for the concrete slab that was to be used as the interior floor of the building. He also claims that he used 40 cubic yards of cement to pour in the holes drilled to support the floor. We have reviewed the evidence adduced in support of appellant’s reconventional demand; and as a result of our evaluation of the evidence we cannot say the conclusions of the trial court are clearly erroneous. The trial judge in analyzing the evidence said:
“Turning to the reconventional demand, this court cannot conclude that the defendant and the plaintiff in reconvention has in any respect proved the reconven-tional demand by a preponderance of the evidence sufficient to justify a judgment on the reconventional demand. The testimony of several of the witnesses, both Mr. Ryan’s witnesses and Mr. Guillot’s witnesses, all lead me to the same com-clusion, that when you have a tremendous amount of fill of the depth of four feet or in that nature that it is simply a wise and normal and ordinary good building practice to dig these post hole pilings, they call them, where the concrete goes down through the new fill to the level of the hard dirt which existed prior to the beginning of the construction and Mr. Willie, the last witness, *759 clearly explained how you do it: tying the steel rods through that concrete post into the wire mesh which is underneath the whole floor and it makes it solid; it keeps it from moving laterally and it is designed to keep it from cracking and the fact that that had to be done in this case can in no way, in this court’s conclusion, be laid to rest at any fault on Mr. Guillot.” By
For the above and foregoing reasons, we conclude that the lower court was correct in awarding the plaintiff judgment for the value of the dirt hauled, delivered and spread by the plaintiff under his contract with the defendant; and that the lower court correctly rejected the reconventional demand of the defendant. The judgment of the trial court is affirmed at defendant-appellant’s cost.
Affirmed.